# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00493-COA

RAPHVELL BRADFORD A/K/A RAPHAEL BRADFORD          APPELLANT

v.

STATE OF MISSISSIPPI          APPELLEE

DATE OF JUDGMENT:      04/04/2022
TRIAL JUDGE:      HON. BARRY W. FORD
COURT FROM WHICH APPEALED:      HUMPHREYS COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:      ROBERT FRED LINGOLD JR.
     CAMERON LEIGH BENTON
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
     BY: DANIELLE LOVE BURKS
DISTRICT ATTORNEY:      AKILLIE MALONE OLIVER
NATURE OF THE CASE:      CRIMINAL - FELONY
DISPOSITION:      AFFIRMED - 04/16/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., GREENLEE AND McCARTY, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1. A Humphreys County Circuit Court jury found Raphvell Bradford guilty of first-degree murder for killing Michael Yarber. The trial court sentenced Bradford to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections (MDOC). After the trial court denied his post-trial motion, Bradford appealed. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On the evening of February 28, 2020, Bradford shot and killed his neighbor Yarber,

known as "Mike D."[1]  Bradford told authorities that he killed Yarber in self-defense after Yarber broke into Bradford's trailer wielding a knife.  Bradford was indicted for first-degree murder under Mississippi Code Annotated section 97-3-19 (Supp. 2017).

¶3.   A trial was held in March 2022.  Officer David James, an investigator for the Humphreys County Sheriff's Department, testified he received a call regarding the shooting. Arriving at the crime scene, the officer observed Yarber's deceased body with a gunshot wound to the head, lying in the yard "between [Yarber's] shed and [Bradford's] trailer." Officer James estimated that Yarber's body was approximately ten to fifteen feet from "[t]he back of Mr. Bradford's trailer."

¶4.   Officer James testified that blood was found inside Yarber's shed, and the photographs of the shed's interior admitted into evidence depicted dark-red liquid pooled on the floor and splattered on the mattress and bed linens.  The defense objected to the officer's testimony and the admission of the photos on the basis that there were "no crime lab or tests that actually have tested this substance to actually verify that it was blood" and that the photos were cumulative.  The trial court overruled the defense's objections.  When the defense later asked Officer James whether he had sent items found in Yarber's shed for analysis, he stated that he "knew that was blood."

¶5.   Officer James further testified that three bullet casings were found approximately seventy feet from the shed, which indicated to the officer "[t]hat the shot was fired out there in the streets."  Noting a metal strip from the shed's doorway had been pulled away and had

---

[1] Yarber lived in a small shed located behind Bradford's trailer.

a splatter of blood on it, Officer James concluded Yarber's body had been "drug out the shed" into the yard. However, Officer James did not observe any abrasions or bruises on the victim.

¶6. Bradford's .40-caliber pistol had been recovered, and Officer James interviewed Bradford at the county jail. Bradford admitted that he shot Yarber but claimed it was self-defense because Yarber had broken into his trailer wielding a knife. Officer James, however, observed no signs of a forced entry around the trailer's back door. The State admitted photos of the interior of Bradford's trailer. Officer James noted that the television was lying "against the end table" and that several pictures were off the wall. Because "the [television] screen hadn't been broken or nothing," he speculated that the television had been purposely moved. Officer James saw no other items damaged or knocked over; nor were there any blood or bullet casings found inside Bradford's trailer. He later acknowledged during cross-examination that the television's placement and the items in disarray "could be" evidence of a struggle. With regard to Bradford's claim that Yarber attacked him with a knife, Officer James said that he did not recall whether Bradford had cut marks on his hands. On redirect, the State asked Officer James if Bradford had "visible cuts" on his hands. The officer replied, "Not to my knowledge." Bradford was not medically treated for any cuts.

¶7. Travis York and Aaron Newell, Yarber's cousins, testified that they were standing outside a nightclub on the night Yarber was killed when Bradford drove up in his car exclaiming that he had killed Yarber. When Bradford told Newell that he had "killed Mike D, he tried to rob me," Newell advised Bradford "to make it easy, just go turn [himself] in."

3

Newell went to Yarber's home and was the first person to arrive at the scene. Observing Yarber's body in the yard, Newell initially "thought he was just sleeping." Newell stated that Yarber's body was "over to the left side" of the "little house" (i.e., Yarber's shed). He testified that the back door of Bradford's trailer was open and that "stuff had been turned over" as if "somebody had been fighting," but he did not see any blood in the trailer.

¶8. Earline Yarber, the victim's mother, testified that her son and Bradford had been friends since they were children. She saw her son at approximately 5:00 p.m. that evening and gave him money. Earline saw Yarber again a short time later at a convenience store, and she gave him a ride home. Yarber said he was buying stuff for Bradford at the store. When they arrived at Yarber's shed, she saw Bradford sitting outside in a car. Yarber told Earline that he was going to bed. A short while later, she returned, and Newell told her that Yarber had been shot. She saw Yarber lying "[r]ight beside his little house . . . with no shirt on[,] pants pulled on[,] and one shoe on."

¶9. The state medical examiner Dr. Mark LeVaughn testified that Yarber would not have been able to walk ten or fifteen feet away from where he was shot because his fatal gunshot injury caused massive blood loss and would have been "instantly incapacitating." Because no "soot or stippling" appeared on the victim's skin, he testified that "the end of the barrel of the gun was three feet away or greater" when the gun was fired. Dr. LeVaughn also opined that the substance in the photo depicting the interior floor of Yarber's shed appeared to be blood.

¶10. After the State rested, Bradford testified regarding the events preceding the shooting.

4

Bradford's girlfriend had received a tax refund; so she and Bradford went to the casinos and shops. Bradford bought "shoes, clothes, [and] jewelry." Yarber's brother Jarcarius visited him the next morning and commented on the purchases. After Jarcarius left, Bradford purchased new tires and headlights for his car. Later that day, while Bradford was installing the headlights, Yarber came over. Yarber found a bottle of gin in Bradford's car, and Bradford told him he could have it. When Yarber finished the bottle, he asked if Bradford would buy him another one, and Bradford agreed. Yarber then went to the store and returned with his mother. Bradford said Yarber appeared to be arguing with her. When Yarber got out of the car and walked over to Bradford's car, he was mad that his mother had not given him money. Within thirty minutes, Yarber had drunk the second bottle of liquor. When Bradford refused to purchase Yarber a third bottle, he said Yarber became "upset," cussed him, and left.

¶11. Bradford went inside to take a bath. When he came out of his room, he encountered Yarber coming in the back door of his trailer "swinging a knife." The two men began "scuffling"; Bradford was "falling and tripping over everything." Bradford claimed Yarber cut him "several times across [his] hands." Bradford spotted his pistol on the table and grabbed it. He said he shot Yarber "as we was coming out of the back door." Bradford then "just went to crying" and "ran and jumped in my car and tried to go get him some help." Bradford claimed he did not have a phone to call 911; so he drove until he saw his friends outside the club and confessed to them that he had shot Yarber. Bradford asked Newell to go check on Yarber, and Bradford surrendered to law enforcement.

5

¶12. Bradford acknowledged on cross-examination that for Yarber to rob him was "[v]ery out of character." Although he and the victim had known each other since they were children, Bradford noted that Yarber had "moved away for a long time" and "wasn't the same Mike D no more when he came back." Yet he later claimed that he and Yarber were "best friends" and that he "still loved Mike D through everything."

¶13. Bradford further testified that his back door was rarely used. When asked what had happened to the knife Yarber was allegedly swinging, Bradford said he did not know. Bradford explained that he punched Yarber, causing him to fall on the ground, and then shot him. Bradford speculated that the reason the shell casings were found in the street was because he and some friends were "shooting out there for New Years, out in front of the mailbox."

¶14. The defense rested, and the jury found Bradford guilty as charged. On March 25, 2022, the trial court sentenced Bradford to life with eligibility for parole in the MDOC's custody. Bradford filed a motion for a new trial, alleging (1) that one of the jurors was related to the victim, resulting in prejudice to the defense; (2) that the trial court erred in giving Jury Instruction S-1; (3) that Jury Instruction S-2 was an incorrect statement of the law; (4) there were several violations of his due process and constitutional rights; and (5) the trial court erred in questioning and removing members of the venire without defense counsel and the defendant present. The trial court denied the motion for a new trial, and Bradford appeals, raising several issues we address in turn.

**DISCUSSION**

6

## I. Whether a juror was a relative of the victim.

¶15.  Claiming that juror Charles Bailey was related by marriage to Yarber's sister,[2] Bradford argues he is entitled to a new trial because his right to a fair and impartial jury was violated.  During voir dire, the prosecution asked the venire if anyone was "familiar with the murder and the death [of Yarber]," if anyone knew the witnesses, and if anyone knew other members of the venire.[3]  Defense counsel also asked if anyone was "close relatives to anyone that is here."  Bailey did not respond to any questions posed during voir dire.

¶16.  "It is . . . a judicial question as to whether a jury is fair and impartial and the court's judgment will not be disturbed unless it appears clearly that it is wrong." *Odom v. State*, 355 So. 2d 1381, 1383 (Miss. 1978).  The Mississippi Supreme Court held in *Odom* that "[t]he failure of a juror to respond to a relevant, direct, and unambiguous question leaves the examining attorney uninformed and unable to ask any follow-up questions to elicit the necessary facts to intelligently reach a decision to exercise a peremptory challenge or to challenge a juror for cause." *Id*.

> When deciding on a motion for a new trial based on a juror's failure to respond during voir dire, the trial court should first "determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited." *Odom*, 355 So. 2d at 1383.  Second, "if the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in

---

[2] Bradford contends that Bailey's brother is married to Yarber's sister.

[3] We note that two venirepersons (Jurors 25 and 47) had stated that Yarber's mother was their aunt.  Yet when the prosecution asked if members of the venire knew one another, neither indicated they were acquainted with Bailey (although other unrelated persons did know him).

7

selecting the jury reasonably could be inferred from the juror's failure to respond." *Id*. The defendant deserves a new trial if such prejudice can be reasonably inferred. *Id*.

*Magee v. State*, 124 So. 3d 64, 67 (¶8) (Miss. 2013). If a party can demonstrate "that a juror withheld substantial information or misrepresented material facts, and . . . a full and complete response would have provided a valid basis for challenge for cause[,] we presume prejudice." *Jasper v. State*, 302 So. 3d 682, 688 (¶26) (Miss. Ct. App. 2020) (emphasis omitted) (quoting *Merchant v. Forest Fam. Prac. Clinic P.A.*, 67 So. 3d 747, 757 (¶22) (Miss. 2011)).

¶17. However, "a defendant bears the burden of showing he was prejudiced by the jury selected or that the jury was biased or less than impartial." *Id*. (internal quotation marks omitted); *see also Ambrose v. State*, 254 So. 3d 77, 119-20 (¶131) (Miss. 2018) (requiring a party to "present evidence" that indicates the "jury was not fair and was partial" and to demonstrate "prejudice resulted from the [trial court's] handling of voir dire"). Bradford presented no affidavits or other evidence to the trial court in support of his claim that Bailey was related to Yarber or that he was somehow prejudiced by Bailey's presence on the jury. "Allegations of fact in a motion for a new trial must be supported by proof." *Dyer v. State*, 300 So. 2d 788, 789 (Miss. 1974). Accordingly, we find no error in the trial court's decision to deny Bradford's motion for a new trial as to this issue.

## II. Whether the trial court erred in denying the defense's objections based on *Brady v. Maryland*.

¶18. Bradford argues that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), because of the failure "to timely provide photographs of the crime scene, the absence of any lab report regarding requested blood analysis, [and] the missing video recorded statements[.]"

8

In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87.

¶19.    Whether a *Brady* violation occurred is reviewed de novo. *Chisholm v. State*, 365 So. 3d 229, 242 (¶51) (Miss. 2023). Establishing a *Brady* violation requires a defendant to show:

> (1) that the government possessed evidence favorable to the defendant (including impeachment evidence);
>
> (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence;
>
> (3) that the prosecution suppressed the favorable evidence; and
>
> (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*Id*. "[T]he defendant[] must meet all four prongs of the test in order to prove that a *Brady* violation occurred." *Mohamed v. State*, 323 So. 3d 532, 550 (¶55) (Miss. Ct. App. 2021) (internal quotation marks omitted).

### A.    Photographs

¶20.    Bradford complains that two photographs not provided to the defense during discovery were erroneously admitted into evidence. The first photograph was a picture of the exterior of Bradford's trailer and Yarber's shed taken from the road. Although defense counsel initially asserted that he had "never seen" the photograph, he subsequently assured the trial court, "We're okay. We've viewed it now." When the trial judge asked if the

defense had "any objection to it coming in," Bradford's counsel said the only objection "would be based on scale." The second photograph was of bullet fragments taken during Yarber's autopsy. Bradford's attorney objected on the ground that this photograph was not provided during discovery, but the trial judge overruled the objection.

¶21. The record does not indicate if the State provided these photographs to the defense during discovery, and the trial court made no findings in this regard. Therefore, we find Bradford failed to establish that the State suppressed this evidence (i.e., the third prong). Even if we assume that the State suppressed the photographs and that the defense did not possess them, Bradford has not specified how the photographs were favorable to his defense. *See Montgomery v. State*, 891 So. 2d 179, 184 (¶10) (Miss. 2004) (rejecting defendant's claim of a *Brady* violation, noting there was "no proof in the record that would allow [the appellate court] to decide whether the evidence allegedly suppressed was favorable or unfavorable"). Nor has Bradford demonstrated a reasonable probability that had the two photographs been disclosed to him prior to trial, the result of the proceeding would have been different.

### B. Blood-Analysis Test

¶22. Bradford also argues, "It is plausible that the State's failure to produce a blood analysis resulted in the withholding of exculpatory evidence or at the very least impeaching evidence in violation of *Brady*." At trial, Officer James testified blood was inside Yarber's shed, and the State submitted photos of the shed's interior into evidence. The photos depicted a pool of dark-red liquid on the floor and splatters of the liquid on the bed and

10

linens, which trailed off onto the floor. Defense counsel objected to the introduction of photos of the victim's home because "*there has been no crime lab or tests that actually have tested this substance* to actually verify that it was blood." Bradford's counsel further noted, "[Officer James] has not done any medical reports or had this substance tested to label it as blood[;] . . . [s]o he can't state that it's conclusively blood from that witness stand without having any type of lab reports to attest to. . . ." The court overruled the defense's objection. The State later inquired, "Officer James, the State would stipulate that you haven't tested any substance to confirm that it's blood; is that correct?" He replied, "Yes, ma'am." Officer James confirmed that he saw what appeared to be blood in the victim's shed, with no objection by the defense.

¶23. On cross-examination, Bradford's attorney asked Officer James if he sent "what you thought was blood to a crime lab to be tested?" He said, "No," but remarked that he knew "blood from ketchup" and "knew that was blood." Officer James also confirmed on redirect that he saw no ketchup or empty hot sauce bottles in the shed. After being shown a photo depicting a dark-red pool of liquid on the floor of Yarber's shed (Exhibit S-6), Dr. LeVaughn also testified that based on his expert opinion, the substance appeared to be blood, with no objection made by defense counsel.

¶24. However, defense counsel later asserted at trial, "We have a report that there was some clothing that was submitted for blood analysis." The State maintained that it had no such report and was unaware of what defense counsel was talking about. Defense counsel argued that "[i]f they submitted something to the crime lab concerning blood, we should have

11

the results." After further discussion, the prosecutor said, "*I can tell you now that I don't have a report. I don't have this clothing. I don't have anything . . . .*" (Emphasis added). Defense counsel argued "that could be something that is exculpatory . . . ." The trial court just stated, "Okay. That's it," and the bench conference concluded. Defense counsel continued to assert that "documentation was submitted" indicating clothing was sent to the crime lab for blood analysis, so "[t]here should have been results."[4] The trial judge allowed the proffer but recognized the State's position that it did not have the report. The judge further noted, "I don't think that material had anything to do with your theory of the case that it was self-defense, even though the [S]tate has indicated that they don't have in their possession any of the requested material." Later, the defense recalled Officer James as a witness and asked if he sent clothing to the crime lab for blood analysis. Officer James said he "sent quite a few stuff" and that "everything that I took down there, sir, is in the bag."

¶25. The only evidence presented of any blood analysis that may have been performed is Officer James's response to the defense that he "sent quite a few stuff" for blood analysis. But he also said that if the blood analysis had been done, a copy would be in the case file. Nothing in the record indicates whether any clothing was sent or whose clothing it may have been. The State emphatically denied having any blood-analysis report, and defense counsel even acknowledged during Officer James's initial testimony that the liquid found in Yarber's shed had not been tested. Therefore, Bradford has not satisfied the first and third prong to establish a *Brady* violation. We further find Bradford's mere speculation that the disclosure

---

[4] This documentation was not presented to the trial court.

12

of this alleged report would have been exculpatory "[*i*]*f*" it showed that the substance was not blood or that the blood was not the victim's fails to satisfy the last prong.

### C.  *Video of Bradford's Statement to Authorities*

¶26.  The only video recording of Bradford's statement provided to the defense prior to trial was approximately twenty minutes in length and appeared to be "cut off."  When Officer James could not recall if Bradford displayed any cut marks on his hands, defense counsel asked Officer James if he was aware of "any videos, during the course of your investigation, of Mr. Bradford['s] being in a room with his parents not knowing he was being recorded." Officer James responded, "Yes, sir, . . ." but when asked if either Bradford or his parents knew they were being recorded, the officer said that he did not know. The State objected, claiming, "This is outside the scope of his knowledge. . . [H]e was not part of that portion of the video that [the defense is] referring to."  The trial court overruled the objection.

¶27.  Defense counsel then asked Officer James, "You've seen the video[,] right?"  He replied, "No[,]" and asked, "What video are you talking about?"  After the defense attorney clarified, "[W]hen you all had him in the chapel," the officer averred, "I don't recall seeing that video, sir."  When asked again about Bradford's hands, the officer said that he did not recall any injuries but noted that everything had been recorded.  Defense counsel approached the bench and asked for the alleged video, claiming, "[T]he video that we [were] given that's 20 minutes long because it's cut off at his statement."  The State said, "*We gave him everything that we have.  The video that they have is the video that we have.*" (Emphasis added).

MR. CARR:          Well, I would like, if it's okay with Court, because we've had a witness to state under oath that there was a recorded video. If they don't have it, I think they should inquire and provide it to us so we can review that video. There could be something exculpatory. He testified from the witness stand. And I'm not saying that they're doing anything foul play. They're officers of the Court just like I am. But if a witness testified that there was recorded testimony, we should be privy to that, Your Honor.

MS. EVANS:         And I absolutely agree with that. Again, we were provided with that video probably, what, less than two weeks ago I know. We saw the same video and saw the cutoff at the same point. We inquired about why it cut off but that is all that the investigators were able to provide us. *We don't have anything else. We gave it to you. And they have nothing else.* That's all they – that's all they could give us. And that's all we can give you unfortunately.

THE COURT:         I'm satisfied. If something else comes up, but right now under *Brady* I think they've given you everything they have.

(Emphasis added). The defense inquired whether the State would talk to the chief deputy. The State responded, "He's the one who provided that video we have now. That we both have. That is all he has. He gave us that copy. . . . And we have inquired about anything else. That's all they have. I don't know what else to say." At the conclusion of day two of the trial, defense counsel acknowledged that the State had "reached out and confirmed" with the sheriff's department "that they don't have anything additionally."

¶28.   Bradford argues that the State's "most egregious failure" was not "to preserve and provide complete copies of videotaped statements given by the Defendant to law enforcement." He contends, "The absence of the video recorded statements is tantamount

14

to a *Brady* violation[,] which was exacerbated in this case where there were no eyewitnesses and no physical evidence to suggest it was not self-defense." We find the trial record clearly shows that the State neither possessed nor suppressed any alleged exculpatory video statement. Bradford has also failed to demonstrate how this alleged video, if disclosed, would have affected the outcome of the proceedings except to speculate that the video "*could have corroborated*" his testimony and "*could* have" confirmed that he had defensive cuts on his hands. (Emphasis added). We therefore find Bradford failed to establish a *Brady* violation.

### III. Whether the trial court erred by failing to instruct the jury properly.

¶29. Bradford submits there are errors with regard to certain jury instructions that warrant a new trial. The standard of review for a trial court's decision to give or refuse a jury instruction is abuse of discretion. *Sands v. State*, 315 So. 3d 1066, 1070 (¶10) (Miss. Ct. App. 2020). "When considering a challenge to a jury instruction on appeal, we do not review jury instructions in isolation; rather, we read them as a whole to determine if the jury was properly instructed." *Id*. (quoting *Rubenstein v. State*, 941 So. 2d 735, 784 (¶224) (Miss. 2006)). "[I]f the instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results." *Id*. (quoting *Milano v. State*, 790 So. 2d 179, 184 (¶14) (Miss. 2001)).

¶30. Bradford first claims the trial court erred by failing "to properly instruct the jury as to self-defense," noting the jury's apparent confusion with Jury Instruction S-3, which provided:

15

The Court instructs the jury that Second-Degree Murder is the killing of a human being when done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual. The Court further instructs you that if you believe from the evidence in this case, beyond a reasonable doubt, that:

(1) the Defendant, **Raphael Bradford,** on or about February 28, 2020 in Humphrey County, Mississippi;

(2) did willfully, unlawfully, and feloniously, while in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual did kill Michael Yarber[,] then Raphael Bradford is guilty of Second-Degree Murder, and it is your sworn duty to so find. Should the State fail to prove any of these elements, then you must find the defendant not guilty of Second-Degree Murder.

Defense counsel objected to S-3 on the ground there was "no evidence presented for a second degree, lesser included offense." The State initially agreed to withdraw the instruction but then rescinded its withdrawal moments later. The defense continued to argue that the instruction was not an accurate statement of the law, as "[t]he self-defense element is missing in S-3[,] which is one of the elements for the correct statement of the law." The trial court overruled the defense's objection and gave the instruction.

¶31. Later, during jury deliberations, the jury sent the trial judge a note, inquiring, "We would like to know if the definition of second[-]degree murder is self-defense." Defense counsel asserted "that the answer would be no." The trial court gave defense counsel a choice—the court could simply respond "no" or instruct the jury to refer to the jury instructions. The defense replied, "The objection has been noted for the record. But we will go with refer to the jury instructions."

16

¶32.    In *Harris v. State*, 861 So. 2d 1003 (Miss. 2003), the Mississippi Supreme Court held that it was "not error to give an instruction that omits the words 'not in necessary self defense' when charging depraved heart murder when the [c]ourt also instructs the jury in a separate instruction that the killing would be justified if committed by the defendant in the lawful defense of his own person." *Id*. at 1015 (¶28).  Although Bradford admits a separate "self-defense instruction was given," he contends that this instruction "did not cure the defect with S[-]3 as exemplified by the jury's confusion."

¶33.    We find no error with regard to the challenged instruction.  Both S-10 and D-2 instructed the jury that Bradford had a right to defend himself with deadly force if he reasonably believed Yarber intended to kill him or cause him "great bodily harm," and such danger was imminent.  Additionally, D-5 informed the jury that the State had the "burden of proving the defendant guilty beyond a reasonable doubt and that the defendant did not act in self-defense, and if it fails to do so, it is your sworn duty you must find the defendant 'Not Guilty'."  We therefore find the jury instructions, taken as a whole, fairly announced the applicable law.

¶34.    Bradford also argues that the facts of the case warranted the giving of a castle-doctrine instruction.[5]  However, defense counsel withdrew the proposed castle-doctrine instruction

---

[5] The castle doctrine, codified in Mississippi Code Annotated section 97-3-15(3) (Rev. 2020), states:

> A person who uses defensive force shall be presumed to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon him or another or upon his dwelling, or against a vehicle which he was occupying, or against his business or place of employment or the immediate premises of such business or place of employment, if the person against whom

(D-9). Moreover, the only jury-instruction issues raised in Bradford's motion for a new trial concerned the State's instructions for first-degree and second-degree murder. In *Ashmore v. State*, 302 So. 3d 707 (Miss. Ct. App. 2020), this Court found the defendant was procedurally barred from asserting "the 'Castle Doctrine' defense, given that he proposed no such instruction *and failed to raise it with the circuit court in his post-trial motions*." *Id*. at 713 (¶17) (emphasis added). "To preserve an error for appeal, it must first have been raised to the trial court below." *Id*. (citing *Manyfield v. State*, 296 So. 3d 240, 248 (¶26) (Miss. Ct. App. 2020)). We find Bradford is procedurally barred from raising this claim for the first time on appeal.

### IV. Whether the trial court erred by allowing allegedly gruesome cumulative photographs of the victim to be admitted into evidence.

¶35. At trial, the State moved to admit four photographs of the victim's body at the crime scene. Defense counsel objected on the basis that the photos were "cumulative," and the trial

---

the defensive force was used, was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered, a dwelling, occupied vehicle, business, place of employment or the immediate premises thereof or if that person had unlawfully removed or was attempting to unlawfully remove another against the other person's will from that dwelling, occupied vehicle, business, place of employment or the immediate premises thereof and the person who used defensive force knew or had reason to believe that the forcible entry or unlawful and forcible act was occurring or had occurred. This presumption shall not apply if the person against whom defensive force was used has a right to be in or is a lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or is the lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or if the person who uses defensive force is engaged in unlawful activity or if the person is a law enforcement officer engaged in the performance of his official duties.

Miss. Code Ann. § 97-3-15(3).

18

court overruled the objection. Because Bradford's counsel did not object on the basis that the photos were gruesome or inflammatory, we find he has waived this issue on appeal. "Objection on one ground at trial waives all other grounds for objection on appeal." *Young v. State*, 236 So. 3d 49, 57 (¶37) (Miss. 2017). Bradford also failed to raise this issue in his motion for a new trial. *See Boyda v. State*, 57 So. 3d 61, 67 (¶24) (Miss. Ct. App. 2011) (finding the failure to raise an issue in a motion for a new trial serves as a procedural bar to appellate review).

¶36. Procedural bar aside, the four photographs, which depicted Yarber's lying in the grass, wearing only a pair of pants, and having a gunshot wound to his head, were probative of the manner and circumstances of how the shooting occurred. *See Ambrose v. State*, 254 So. 3d 77, 135 (¶187) (Miss. 2018) ("A photograph has a meaningful evidentiary purpose when it: (1) aids in describing the circumstances of the killing; (2) describes the location of the body or cause of death; or (3) supplements or clarifies witness testimony."). Furthermore, the supreme court "has consistently upheld the admission of photographs depicting bloody injuries." *Martin v. State*, 289 So. 3d 703, 706 (¶11) (Miss. 2019). We also recognize that a trial court's discretion "to admit photos in criminal cases . . . runs toward almost unlimited admissibility regardless of gruesomeness, repetitiveness, and the extenuation of probative value." *Ambrose*, 254 So. 3d at 135 (¶187). We find no error.

  **V. Whether the trial court erred by refusing to allow the defense to question Officer James regarding the victim's allegedly violent criminal history.**

¶37. Bradford's attorney asked Officer James if he was aware whether Yarber had prior

felony convictions. The court sustained the prosecution's objection to this question. Because Bradford claimed he shot Yarber in self-defense, he contends that the victim's propensity for violence "was highly relevant to the jury's determination of guilt or innocence" and that the trial court's "exclusion of any line of questioning in this regard was prejudicial[.]"

¶38. After sustaining the State's objection to the testimony, the trial court allowed the defense to make a proffer of any evidence regarding the victim's prior felony convictions. The defense failed to do so. "[W]hen testimony is not allowed at trial, a record of the proffered testimony must be made in order to preserve the point for appeal." *Davis v. State*, 130 So. 3d 1141, 1150 (¶32) (Miss. Ct. App. 2013). Bradford has therefore failed to preserve this issue for appeal.

¶39. Procedural bar notwithstanding, we find no error. Although "evidence of a person's character is usually not admissible to show that on a particular occasion, he acted in conformity with his character[,] . . . the defendant may be allowed in certain circumstances to present evidence of . . . the victim's character." *Dille v. State*, 334 So. 3d 1162, 1186 (¶64) (Miss. Ct. App. 2021). Specifically, Mississippi Rule of Evidence 404(a)(2) "authorizes inquiry by a criminal defendant into a victim's character . . . to prove that the victim was the initial aggressor and that the defendant acted in self-defense." *Harvey v. State*, 365 So. 3d 218, 225 (¶51) (Miss. 2023) (citation omitted). In *Bell v. State*, 303 So. 3d 22, 27 (¶17) (Miss. Ct. App. 2020), this Court noted that "[e]vidence of prior violent acts of the victim, *when known to the defendant*, are also relevant and admissible under Rule 404(b) to show the defendant's state of mind at the time of the incident and the reasonableness of

20

his use of force." Thus, because Officer James's knowledge of Yarber's alleged prior felony conviction(s) was irrelevant, we find no error in the trial court's ruling to sustain the objection to the question. The trial court's ruling did not prevent defense counsel from questioning Bradford during his case-in-chief whether Bradford had knowledge of any prior violent history by the victim; yet defense counsel did not do so. We also note that Bradford stated it was "[v]ery out of character" for Yarber to try to rob him. Accordingly, we find no merit to Bradford's argument.

## VI. Whether Bradford received ineffective assistance of trial counsel.

¶40. Bradford asserts several claims of ineffective assistance of trial counsel that he alleges prejudiced the outcome of his trial. Our review of a claim of ineffective assistance of counsel on direct appeal is limited to the appellate record. *Gregg v. State*, 372 So. 3d 132, 137 (¶13) (Miss. Ct. App. 2023).

> This Court will address such claims on direct appeal when [(1)] the record affirmatively shows ineffectiveness of constitutional dimensions, or [(2)] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed. We may also address such claims on direct appeal when the record affirmatively shows that the claims are without merit. If the record on direct appeal is insufficient to address a defendant's ineffective assistance claims, we will dismiss the claims without prejudice, preserving the defendant's right to raise the claims later in a properly filed motion for post-conviction relief.

*Id*. (citations and internal quotation marks omitted). Neither party stipulates that the record is adequate to resolve Bradford's claims; so we must determine whether the record affirmatively demonstrates that he was denied effective assistance of counsel or that his claims are without merit.

21

### A. Failure to Inform Bradford He Did Not Have to Testify

¶41.　Bradford asserts that neither his trial counsel nor the trial court advised him that "he did not have to testify," and this deficiency by counsel prejudiced him "by leaving him exposed to rigorous cross-examination." Prior to the defense's case-in chief, Bradford's defense attorney asked the trial court during a bench conference to inform Bradford of "his right to refuse to testify." The trial judge responded, "Mr. Carr, . . . you've advised him, he knows, and you've advised him, but he has the constitutional right to take the stand if he so desires. *He also has a constitutional right not to testify*." (Emphasis added). The trial court also noted that it would instruct the jury to not make inferences from the defendant's decision not to testify. Defense counsel asked for a few minutes to talk with Bradford, and the trial court recessed for fifteen minutes. After resuming the trial, defense counsel advised the court that Bradford would testify. As the State correctly notes, "Bradford's privileged conversation with his attorney is not part of the record[.]" For this reason, we conclude that the record is insufficient to determine whether defense counsel directly and adequately informed Bradford of his right not to testify.

### B. Failure to Enter the CAD Report into Evidence

¶42.　During the defense's case-in-chief, Bradford's attorney questioned Officer James about the CAD report[6] of the incident, particularly whether it contained any reference to a stabbing. Defense counsel, however, did not move to introduce this report into evidence. Claiming the CAD report "would have given credibility to [his] testimony that Yarber had

---

[6] The CAD report is a computer-generated document that contains dispatch call times and incident information.

a knife," Bradford asserts his attorney's failure to request that the report be admitted into evidence constituted ineffective assistance of counsel.

¶43.   The referenced CAD report is not part of our record, and there is no discussion at trial as to why defense counsel did not seek to admit it into evidence.  Therefore, we find this issue cannot be fully developed from the record, and we are unable to make a determination as to the merits of this claim on direct appeal.

### C.    Failure to Provide Accurate Jury Instructions

¶44.   Bradford contends that his trial counsel was ineffective by withdrawing Jury Instruction D-9, a "castle doctrine" instruction.  Typically, a trial counsel's decision whether to request certain jury instructions "is a matter of trial strategy" and, as such, "do[es] not amount to ineffective assistance of counsel."  *Henderson v. State*, 281 So. 3d 1058, 1064 (¶18) (Miss. Ct. App. 2019).

¶45.   In *Henderson*, the defendant asserted that his trial counsel was ineffective for failing to request a castle-doctrine instruction, "stand-your-ground instruction, and a defense-of-others instruction."  *Id*. at 1063 (¶14).  We noted that in closing arguments, defense counsel "did not even reference the castle doctrine or stand-your-ground gun laws."  *Id*. at 1064 (¶17).   We thereby concluded that the defendant "fail[ed] to overcome the strong presumption that his trial attorneys' failure to offer instructions on the castle doctrine, standing your ground and defense of others was not part of their trial strategy."  *Id*. at (¶19).  "Based on the questions asked by [his] trial attorneys and the closing argument they made to the jury, the defense's primary theory appeared to be that Henderson shot Pugh purely in

23

self-defense." *Id*. at 1064-65 (¶19).

¶46.    In this case, defense counsel had a proposed castle-doctrine instruction (D-9) but withdrew it without explanation. Thus, there is no indication from the trial record why Bradford's counsel made the decision not to request that this instruction be given. Bradford also notes that defense counsel tendered, and the court granted, an instruction (D-10) defining a "dwelling," which he contends was only relevant in the context of the castle-doctrine instruction. When the trial judge questioned defense counsel whether the definition of a dwelling was "an issue in this case," counsel merely noted that there had been testimony regarding the distance between the body and the house. In this instance, we dismiss Bradford's claim without prejudice, as we find the record insufficient to make a determination whether counsel's failure to submit the castle-doctrine instruction was ineffective assistance of counsel or simply trial strategy.

### D.    Failure to Preserve the Record

¶47.    In the "Designation of the Record," the following pertinent items were requested by appellate counsel as "necessary to be included on appeal": "[a]ll pre-trial motions and orders including those related to discovery, motions, and orders for extensions of time"; and "[a]ny and all jury notes either notes taken by the jurors during trial, if allowed, or notes passed to the court from the jurors." Bradford contends that his trial counsel was ineffective in failing to preserve the record for appeal because there are "no transcripts of any pre-trial matters in this case" in the trial court record. A note the jury sent out after deliberations was also not included in the record. Bradford contends this note, which apparently asked a question about

24

a photograph, "may have been pivotal to establishing any one or more of the [d]efendant's assignments of error in this appeal." The transcript is silent as to the content of the note. The only information in the record is that the trial judge presented the note to trial counsel, and defense counsel responded, "I don't think we can answer that particular question." The trial court thus instructed the jury that it would "have to rely upon your recollection of the testimony of the witnesses that testified about taking the photograph." Like Bradford's other ineffective-assistance-of-counsel claims, we cannot address this issue on direct appeal, as the record does not affirmatively demonstrate that his claim is without merit.

¶48. Accordingly, we deny his claims of ineffective assistance of counsel without prejudice for him to bring these claims, should he choose to do so, in a properly filed motion for post-conviction collateral relief.

### VII. Whether the trial court erred by denying Bradford's motion for a directed verdict.

¶49. At the close of the prosecution's case-in-chief, Bradford's attorney moved for a directed verdict, arguing that the State had failed to prove its case. The trial court denied the motion. Defense counsel renewed the motion for a directed verdict at the close of his case-in chief, which the court also denied.

¶50. Bradford contends that the trial court erred in denying his motion for a directed verdict. "An appeal of the trial court's denial of a directed verdict . . . challeng[ing] . . . the sufficiency of the evidence . . . is subject to a de novo standard of review." *Haymon v. State*, 346 So. 3d 875, 881 (¶14) (Miss. 2022) (citing *Gilmer v. State*, 955 So. 2d 829, 833 (¶5) (Miss. 2007)). Viewing the "evidence in the light most favorable to the State," the judgment

25

will be reversed and rendered "only if the facts and inferences point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty[.]" *Id*. (internal quotation marks omitted) (quoting *Young v. State*, 119 So. 3d 309, 315 (¶18) (Miss. 2013)).

¶51. To prove Bradford was guilty of first-degree murder, the State had to prove beyond a reasonable doubt that Bradford (1) killed Yarber; (2) without authority of law; and (3) with deliberate design to effect his death. Miss. Code Ann. § 97-3-19(1)(a). Bradford admitted that he shot and killed Yarber. However, he argues that the State also "had to prove that Bradford acted willfully and with deliberate design to kill Yarber while not acting in self-defense" and that the "proof of each element was scant."

¶52. First, this Court has held that even "scant" evidence may be sufficient to sustain a guilty verdict. *See Carter v. State*, 965 So. 2d 705, 710 (¶19) (Miss. Ct. App. 2007) (noting that while the evidence to support a defendant's conviction for armed robbery was "scant," it "was such that reasonable and fair-minded jurors could find [him] guilty"). Second, the supreme court has recognized that "deliberate design[] may be inferred from the use of a deadly weapon." *Holliman v. State*, 178 So. 3d 689, 698 (¶19) (Miss. 2015) (quoting *Anderson v. State*, 79 So. 3d 501, 507 (¶22) (Miss. 2012)). Again, Bradford admitted that he shot Yarber with his pistol.

¶53. Lastly, the State presented sufficient material evidence for a rational juror to conclude Bradford was guilty of first-degree murder beyond a reasonable doubt. Whether Bradford shot Yarber in self-defense was a jury question. *See Brisco v. State*, 295 So. 3d 498, 510

26

(¶26) (Miss. Ct. App. 2019). Although Bradford testified that he and Yarber "tussl[ed]" after Yarber broke into his trailer, there was minimal, if any, evidence of a fight between Bradford and Yarber in the trailer. Officer James observed no evidence of a forced entry at the back door, and the few items that were lying around appeared to be purposely placed there (e.g., the television).

¶54. As to Bradford's testimony that he shot Yarber when they were coming out his back door while fighting, there was no evidence other than Bradford's own testimony to support his claim of self-defense. The knife Yarber allegedly wielded was not found at the crime scene. Officer James said that Yarber's deceased body was lying approximately ten to fifteen feet from "[t]he back of Mr. Bradford's trailer." Newell stated that Yarber's body "was over to the left side" of Yarber's shed. Dr. LeVaughn further testified that Yarber was shot in the head from a distance greater than three feet and that the fatal shot would have rendered Yarber "instantly incapacitated." There was also a bullet hole in the window of the shed's door. Moreover, photos of the interior of Yarber's shed depicted a pool of dark-red liquid on the floor, which both the officer and Dr. LeVaughn averred to be blood. The photos also showed a trail of blood on the bed linens and mattress. A metal strip from the door of Yarber's shed had blood on it and appeared to be pulled away, which indicated to Officer James that someone had moved Yarber's body from the shed into the yard.

¶55. Viewing the evidence in a light favorable to the prosecution, we find it sufficient for a reasonable juror to conclude that Bradford killed Yarber with deliberate design and without authority of law. Accordingly, we find no error in the trial court's denial of Bradford's

27

renewed motion for a directed verdict.

## VIII. Whether cumulative error requires a new trial.

¶56. Lastly, Bradford asserts that "the cumulative effect of all errors[,] along with the ineffective assistance of counsel, requires . . . a new trial or a judgment of acquittal." "The cumulative-error doctrine holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Galloway v. State*, 374 So. 3d 452, 514 (¶195) (Miss. 2023) (quoting *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss. 2007)), pet. for cert., No. 23-7187 (U.S. Apr. 9, 2024). "However, in cases where no error can be found, there can be no cumulative error." *Smith v. State*, 371 So. 3d 783, 795 (¶42) (Miss. Ct. App. 2023). Because we have found no individual errors warranting reversal, Bradford's argument of cumulative error is without merit.

## CONCLUSION

¶57. Accordingly, we affirm Bradford's conviction and sentence for first-degree murder. For the claims of ineffective assistance of counsel, which we have determined that the trial record is insufficient to address on direct appeal, we dismiss these claims without prejudice to Bradford's right to assert them in a properly filed motion for post-conviction relief.

¶58. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**